UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                                                   Bankruptcy No. 03-30933
                                                                         Chapter 7
Sun Valley Products, Inc.,

        Debtor.
_____/

Kip M. Kaler, as Bankruptcy Trustee,

        Plaintiff,

        vs.                                                              Adversary No. 04-7060

Red River Commodities, Inc.,

        Defendant.
_____/

### MEMORANDUM AND ORDER

Kip M. Kaler, the Bankruptcy Trustee in this case, initiated this adversary proceeding by Complaint filed October 28, 2004, seeking a determination that the sale of Debtor Sun Valley Products, Inc.'s assets to Defendant Red River Commodities, Inc. was a fraudulent transfer pursuant to 11 U.S.C. § 548 and N.D.C.C. § 13-02.1-04. The trustee asserts Red River Commodities paid $900,000.00 less for Sun Valley's assets than they were worth and seeks a judgment against Red River Commodities in that amount. Red River Commodities filed an Answer on November 30, 2004, denying the allegations. The matter was tried on May 16-18, 2005.

### I. FINDINGS OF FACT

Sun Valley is a North Dakota corporation started in 1977 by Andrew Cossette and Robert Gibb. Upon Robert Gibb's death, his interest was transferred to his surviving children. Sun Valley

operated a processing facility for sunflower seeds, pumpkin seeds and soybeans. Red River Commodities, a company engaged in commodity sales and processing, was one of Sun Valley's customers. The processing and roasting industry has only a handful of competitors.

In 2002 Sun Valley was suffering consistent losses. The requirements for human food processing were increasing, and Sun Valley's facility needed substantial upgrades to meet existing and anticipated needs. Sun Valley's shareholders, the members of the Cossette and Gibb families, were unwilling to fund the improvements necessary to increase productivity, and Sun Valley's lender was unwilling to extend further credit. The chief executive of Sun Valley, Douglas Cossette, concluded that without substantial further investment by the shareholders a sale was necessary.

At the request of the Gibb family shareholders, a business consultant, Wayne Bradley, was retained in October 2002 to maximize return to the company and shareholders. The Gibb family retained Attorney Greg Selbo to represent their interests in the anticipated sale, and Attorney Michael McNair was retained to represent Sun Valley.

Doug Cossette did not list Sun Valley's assets for sale with a broker or formally approach each of the other industry businesses to inform them of Sun Valley's intention to sell its assets. However, Doug Cossette was familiar with the relatively small market of processors in the region. Cenex Harvest States, another industry business, had a right of first refusal to purchase Sun Valley's assets. Doug Cossette testified he talked to Cenex Harvest States regarding the possible purchase of Sun Valley's assets, but Cenex Harvest States was not interested. Doug Cossette testified that he also spoke with the owner of Sigco, but he was likewise uninterested in purchasing Sun Valley's assets. Prior to 2000, Sun Valley had discussed joining forces with two other members of the

2

industry, Dahlgren and Dakota Natural Foods, but the parties had not come to terms. Doug Cossette believed Red River Commodities was the most interested and viable potential purchaser.

Robert Majkrzak, president and chief executive officer of Red River Commodities, testified that Red River Commodities decided to expand in 2002 either by building a new facility or purchasing an existing facility. He testified that Red River Commodities' parent company had specific financial objectives, including a 15% return on capital employed in acquiring a facility. Robert Majkrzak was familiar with Sun Valley's operation and had a good understanding of its assets. Sun Valley's financial statements indicated it was losing money at a disturbing rate, and Red River Commodities knew that an infusion of approximately $1.5 million would be necessary to bring Sun Valley's facility up to standards. Robert Majkrzak testified that the parent company had the strong opinion that building a new facility would be preferable to purchasing an existing facility, but he convinced the parent company that Sun Valley's assets could be converted into a viable business. On October 22, 2002, Red River Commodities sent a letter to Sun Valley stating it had completed a review with its management on the possible acquisition of Sun Valley and also seeking additional information so it could conduct more detailed due diligence.

On January 7, 2003, Wayne Bradley apprised Bob Gibb of the situation. His notes memorializing the conversation state that he suggested to Bob Gibb that Red River Commodities might be biding its time "to let Sun Valley go to its knees and then come along to bail out Sun Valley (@ very low price) and have almost complete control of the [acquisition]." At trial he elaborated on this note, testifying that he emphasized to the shareholders that selling the business as a "going concern" would generate more proceeds than if it were closed and sold piecemeal.

On January 8, 2003, Bob Gibb, Doug Cossette, Tim Dahlsad and Wayne Bradley met to discuss Sun Valley's situation. Doug Cossette reported that Red River Commodities no longer appeared interested in buying Sun Valley's assets. Bradley's meeting notes indicate he responded by stating:

> This is nothing more than low conflict, no contact, high pressure tactic. [Red River Commodities] knows you are in desperate straights and the [sic] apparently have time to wait for you to fail.
>
> If they let the bank (Bremer) close your doors they can be there the next day and will be able to buy it from your lender for 50-70% of the debt. Personal guarantees will then kick in to cover the balance of SBA/Bank guaranteed debt.
>
> The other creditors will then force the company into Chapter 11 because assets and ability to generate profits will be gone — and they will not have been paid.

Doug Cossette reported his unfruitful discussions regarding a possible sale with potential buyers in addition to Red River Commodities. Bradley opined that competitiveness between potential buyers usually generates a higher selling price, but Sun Valley did not have much time to pursue other potential buyers.

On January 14, 2003, Red River Commodities sent Doug Cossette a letter of intent to acquire Sun Valley's assets for $2,600,000.00 for fixed assets plus the book value of inventory and accounts receivable less accounts payable.

In the months leading up to the sale of Sun Valley's assets to Red River Commodities on April 1, 2003, Wayne Bradley made repeated estimations of Sun Valley's assets and liabilities. After receiving Red River Commodities' offer, he calculated that all of Sun Valley's creditors would be satisfied and approximately $1,000.00 would remain. In other words, Red River Commodities' offer

was sufficient to pay all creditors in full, but very little would be left for distribution among Sun Valley's shareholders.

On January 29, 2003, Sun Valley sent Red River Commodities a letter counteroffering to sell the assets for $3,550,000 or "approximately the book value of [Sun Valley]." Red River Commodities responded to Sun Valley's counteroffer on January 31, 2003 in part:

> I have also detailed the method used in evaluating the amount that can be paid for assets by our group. This again, is based on the return on net capital employed, which our group is held to a 15% minimum return. We have taken many of the items mentioned in your letter into account and determined that the company could be "turned-around" and made to be profitable again. Using profit numbers, that for the past 2 plus years has [sic] not existed, sets a value for the assets. The value that we can justify is the original offer of $2.6MM. Let me also point out that another $0.7MM is needed for the working capital into this company, which means [Red River commodities] invests a total of $3.3MM just to get started. We also recognize a need to add capital to this company within the next months and years.

Red River Commodities did offer an additional $60,000.00 payment for the "successful completion of the transaction, continuation of the business, management and workforce remaining intact and general support of the transaction by the owners."

James Krogh, president of Cenex Harvest States, testified that he became aware Sun Valley's assets were for sale in February 2003. He was concerned about Cenex Harvest States's right of first refusal and consulted with legal counsel. Cenex Harvest States did not buy Sun Valley's assets because the sale to Red River Commodities "sounded like a done deal" based on his instincts, and the enforceability of the right of first refusal was legally questionable.

Tim Egeland, chief financial officer of Dahlgren, testified he was not aware Sun Valley's assets were for sale until March 2003 when Robert Majkrzak told him that Red River Commodities was acquiring Sun Valley. However, he knew six months prior to the sale that Sun Valley was having

5

financial troubles, and he met with a lender in January 2003 to discuss the possibility of Dahlgren purchasing Sun Valley. Tim Egeland testified that Dahlgren had great interest in buying Sun Valley in 2003, but did not inquire of Sun Valley about a sale in part because Sun Valley might end up in bankruptcy. He characterized Dahlgren and Red River Commodities as aggressive competitors, and he conceded knowing that the trustee's success in this adversary proceeding would cause Red River Commodities to suffer a significant monetary loss.

On February 4, 2003, Wayne Bradley discussed with Sun Valley's shareholders that the offered price would provide "very close to adequate cash to pay off all creditors in full," but that professional fees and additional costs would result in Sun Valley being just short. They discussed options for satisfying creditors. After the meeting, Wayne Bradley negotiated the interest terms with Sun Valley's secured lender and worked with Attorney McNair on negotiating the debts with unsecured creditors.

On February 6, 2003, Red River Commodities sent Sun Valley a letter of intent outlining the terms of the agreement for the sale of Sun Valley's assets for $2,600,000.00 plus the book value of inventory and accounts receivable at the time of closing less accounts payable assumed.

On February 8, 2003, Wayne Bradley characterized Sun Valley's situation to Bob Gibb and Greg Selbo, as follows:

> My understanding from discussions with Bob Gibb is that not all the Gibb shareholders or trustees are aware of the dire financial condition of [Sun Valley]. The sale we are attempting to accomplish is viewed by those of us who have been involved with [Sun Valley] as the only "bailout" of a failing company that is presently available. Company management and the shareholder group that I have been working with have all indicated that based on the losses of the past couple of years and the loss trend of the current year ($250,000 loss thru 6 months), that none of them are confident enough in the economic viability of the company to justify even considering the $1.0 to $1.5 million additional investment that would be immediately necessary to give that

6

> business a "chance" at being successful again. Accordingly, the purchase offer set forth by [Red River Commodities], despite its small purchase price, is viewed as being much more desirable than the bank foreclosure and Chapter 11 alternative that is probably not far away.

Wayne Bradley testified that Sun Valley's financial situation continued to deteriorate because of additional losses.

Wayne Bradley prepared a worksheet for a meeting with Sun Valley shareholders and their counsel on March 13, 2003 detailing his conclusion that Sun Valley would have a $576,602.00 shortfall and making suggestions as to how the shortfall might be covered.

Representatives of the parties executed a purchase agreement on March 27, 2003, for the sale of Sun Valley's fixed assets for $2,600,000.00 plus inventory at the time of closing.

Attorney Michael McNair sent a letter to Doug Cossette and Tim Dahlsad on March 27, 2003, stating, "It would appear that . . . we cannot pay all of your creditors and claimants or make provisions for their payment[.]" On March 31, 2003, the night before the closing, Wayne Bradley and Tim Dahlsad prepared a compendium to inform the shareholders that they would have a shortfall of approximately $250,000.00. Doug Cossette left a telephone message the same day indicating he was aware Sun Valley would have a $300,000.00 shortfall, but he was not sure what could be done about it. Doug Cossette testified he had every reason to want to generate as much money as possible from the sale because it would have helped the Gibbs and the Cossettes.

Closing was held on April 1, 2003. After the sale, Red River Commodities began operation of the facility and retained most of the former employees of Sun Valley.

Attorney Michael McNair testified that he and Attorney Selbo agreed the sale was an arm's length transaction. He was aware of the concern whether sufficient assets would be available for

7

payment to creditors, but Sun Valley's sole objective throughout the process was to attain the most money possible from the sale of its assets.

Wayne Bradley testified that based on his knowledge of all of the circumstances of Sun Valley's financial situation, Sun Valley probably did not have any alternative to the sale of assets to Red River Commodities after the beginning of February 2003. He explained that Sun Valley's secured creditor was worried, the company was losing money, the shareholders were unwilling to fund the company, and Sun Valley therefore could not afford to lose Red River Commodities as a buyer. Wayne Bradley said that he thought the sale was reasonable under the circumstances and that Sun Valley acted in accordance with his recommendation in completing the sale.

Robert Majkrzak testified he thought the sales price was reasonable at the time of the sale, but now thinks the value of Sun Valley's assets was far less than what Red River Commodities payed.

In Doug Cossette's opinion, Red River Commodities paid more for Sun Valley than it was worth, and Sun Valley "pulled off a miracle."

Doug Cossette testified as to the condition of the equipment and facility as of the date of the sale. Much of the equipment was obsolete and not repairable. The packaging machines were worn out, and the rest of the equipment had slowed with age. Equipment broke down with increasing frequency, and every shutdown resulted in wasted product and reduced productivity. Doug Cossette estimated the total value of Sun Valley's equipment on the date of sale to be between $500,000.00 and $600,000.00.

Doug Cossette also testified as to Sun Valley's facility's many problems. The steel buildings showed the effects of the combination of salt (used in processing) and water. The walls were rusted and needed replacing. The electrical system was also affected by salt and water and needed repair.

The roof leaked, and the insulation had been damaged by water and needed replacing. A separation system was needed because oil was forming in the sanitary lines. The storm sewer system deposited water in a ditch, and the ditch had become filled with dirt and vegetation and generated a foul odor that had in turn generated complaints from neighbors. The dust control system needed substantial reworking to remain in compliance with Environmental Protection Agency regulations. Each month, twenty to thirty rodents were caught in the facility. Notwithstanding these problems, the facility was operating at the time of the sale.

    Robert Majkrzak also described the condition of Sun Valley's facility as of the date of the sale. He conceded that he was aware prior to the sale that several areas of the building needed immediate improvement and that some of the equipment was inoperable or obsolete, but he misjudged the extent of the problems, and many additional problems only became apparent once improvements began. The sanitary system needed a separation filter for straining prior to discharge which required the purchase and installation of new equipment and ongoing chemical additives. The storm sewer system had been installed incorrectly because effluent was allowed to run into the ditch and caused problems with the neighbors. The design of the dust control system had several flaws and the filter systems had not been working for several years prior to the sale. The roasters in the facility had not been properly maintained for two years and had to be rebuilt. A fryer had electrical problems. Eighty-five percent of the building had to be sided with new metal, and 65% of the roof had to be reinstalled. The electrical systems were in very poor condition because they suffered from the corrosive environment and were not properly maintained. The facility had pollution problems, and the building had structural corrosion severe enough that the roof could not support workers.

Jeff Berg was retained by the trustee to perform a retrospective appraisal of Sun Valley's land, buildings and equipment as of the date of the sale. He had appraised Sun Valley's property in 1997 or 1998 and in July 2000 for mortgage purposes. However, he did not view the property on April 1, 2003, and he did not have personal knowledge of the condition of the land, buildings and equipment on the date of the sale. Rather, he viewed the property on May 2, 2005, and interviewed Robert Majkrzak and the site manager for 3.5 hours to ascertain the condition of the property on April 1, 2003. They discussed the improvements that had been made subsequent to the sale. Jeff Berg's opinion was that the market value of the land, buildings and equipment as of April 1, 2003 was $3,500,000.00. The appraisal included the cost approach, income approach, and sales comparison approach. He testified that although this type of appraisal typically takes him 6-8 weeks to prepare, he prepared the appraisal in this case in approximately one week. He conceded he was unfamiliar with some of the facility problems on the date of the sale, but stated his determination of value did not deal with individual problems as line items. He concluded that $3,500,000.00 was the fair market value for the property if it had been advertised for a minimum of 6 months.

A review appraiser develops and reports an opinion as to the quality of another appraiser's work process. Joseph Ibach, an experienced review appraiser, was present during the entire trial, studied Berg's appraisal, and conducted a review appraisal. He testified that Jeff Berg's appraisal lacked sufficient description of the appraised property to meet standards because the intended use of the appraisal was for court, and without sufficient documentation, a user cannot ascertain the physical condition. Joseph Ibach explained that an appraiser must summarize the reasoning supporting his or her analysis to ensure that users understand the rationale for the appraiser's opinion. He opined that the appraisal's failure to provide the rationale for his opinion was its most significant weakness.

Joseph Ibach identified examples of insufficient rationale in each of the three approaches used by Jeff Berg. He criticized the appraisal's cost approach for failing to provide adequate explanation for his depreciation determinations. If depreciation is underestimated, the value will be inflated, so users must understand how an appraiser arrived at depreciation.

Joseph Ibach criticized the appraisal's income approach for not detailing the six-year income and expense history or substantiating the net operating income conclusion of $650,000.00 with reasoning. He stated that $650,000.00 is simply the average of the net operating income for the six years reported, and that averaging is emphatically not a reliable method of indication of a net operating income conclusion.[1] The last three years show a pronounced downward trend, and Joseph Ibach suggested that the appraisal should have explained why the net operating income conclusion was $650,000.00 and not closer to the net operating incomes of the last three years. As an example, the appraisal might have identified an indication of sales going back up to substantiate the departure from recent history. The appraisal also adjusted the net operating income upward in the last four years in amounts ranging from $100,000.00 to $200,000.00 for "payroll expenses that were artificially high" without explaining what specific expenses were too high and why they were deemed too high. Ibach also averred that using capitalization rates from old sales data may not be applicable because capitalization rates are industry norms and change over time. Because the property at issue is complex, the appraisal should have provided more support for the capitalization rate used. Estimated value based on the income approach is calculated by multiplying the subject property's net operating income times the overall capitalization rate. According to Joseph Ibach, the appraisal's net operating

---

[1] The average is actually $648,790.67 which the Court notes would conveniently round to $650,000.00.

income and capitalization rate are both suspect, and therefore the resulting income approach value is suspect also.

He also criticized the appraisal's sales comparison approach because the conclusions were at or exceeded all common units of comparison so the subject property should be superior to all other properties used in the sales comparison approach, but the rationale for such a conclusion is not provided. This too is suspect, according to Joseph Ibach. The appraisal uses $14.00 per hundred weight for the subject property, but the comparable sales ranged between $3.70 and $12.00 per hundred weight without explanation.

An involuntary Chapter 7 bankruptcy petition was commenced against Sun Valley on May 27, 2003.

## II.  CONCLUSIONS OF LAW

The trustee seeks to avoid the transfer of Sun Valley's assets to Red River Commodities pursuant to 11 U.S.C. § 544(b)(1), which provides in pertinent part:

> [T]he trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1). This section expressly authorizes a trustee to avoid a transfer voidable under North Dakota's version of the Uniform Fraudulent Transfer Act ("UFTA"), codified at N.D.C.C. ch. 13-02.1. The policy underlying both the UFTA and section 544 is to preserve assets of the estate for the benefit of creditors. See Soule v. Alliot (In re Tiger Petroleum Co.), 319 B.R. 225, 232 (Bankr. N.D. Okla. 2004). The Bankruptcy Code also contains a provision allowing a bankruptcy trustee to set aside fraudulent transfers, found in section 548. The language of UFTA and section 548 are

12

nearly identical; the only significant difference is a longer statute of limitations under North Dakota law. See N.D.C.C. § 13-02.1-09. Considering the similarities in purpose and language, many courts have concluded that the UFTA and section 548 are in pari materia, and that the same analysis applies under both laws. See, e.g., Grochocinski v. Zeigler (In re Zeigler), 320 B.R.362, 372 (Bankr. N.D. Ill. 2005). The Court finds the reasoning behind these cases persuasive and will analyze the transfer at issue only under the purview of section 548.[2]     Under section 548(a)(1)(B), a transfer that was made within one year of the bankruptcy petition is constructively fraudulent if a debtor was: 1) insolvent on the date the transfer was made and 2) received less than a reasonably equivalent value in exchange for the transfer. 11 U.S.C. § 548(a)(1)(B)(I) and (ii)(I). The parties do not dispute that the transfer falls within the prescribed statute of limitations[3] or that Sun Valley was insolvent when the transfer was made. The parties do dispute whether Sun Valley received reasonably equivalent value for the transfer of assets to Red River Commodities. Here the opinions of the parties diverge, and the crux of the dispute lies.

To succeed on a claim under 11 U.S.C. § 548(a)(1)(B)(I), the trustee must demonstrate, by a preponderance of the evidence, that payments a debtor received were not in exchange for reasonably equivalent value. See Meeks v. Don Howard Charitable Remainder Trust (In re Southern Health Care of Arkansas, Inc.), 309 B.R. 314, 319 (B.A.P. 8th Cir. 2004). This requires analysis of whether: (1) value was given; (2) it was given in exchange for the transfer; and (3) what was

---

[2] The transfer at issue falls within the Bankruptcy Code's shorter statute of limitations and, therefore, reliance on the state statute is unnecessary.

[3] The April 1, 2003 transfer clearly falls within one year of the May 27, 2003 bankruptcy filing.

transferred was reasonably equivalent to what was received. Id. The payment of money is unquestionably the giving of value. See 11 U.S.C. § 548(d)(2)(A) (defining "value"). A transfer is in exchange for value if one is the quid pro quo of the other, see Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.), 267 B.R. 602, 612 (B.A.P. 8th Cir. 2001), and the transfer in this case was an exchange for value. The only issue to be resolved is whether the transferred assets were the reasonable equivalent of $2.6 million.

Outside the foreclosure context, fair market value is the benchmark for determining reasonably equivalent value. BFP v. Resolution Trust Corp., 511 U.S. 531, 545 (1994); see also Dullea Land Co. v. Ideal Ag Corp. (In re Dullea Land Co.), 2001 WL 1892189, at *7 (Bankr. D.N.D. 2001). Whether a transfer is made in exchange for reasonably equivalent value is a question of fact requiring the court to consider all factors bearing value in the marketplace. Armstrong v. United Bank of Bismarck (In re Bob's Sea Ray Boats, Inc.), 144 B.R. 451, 457 (Bankr. D.N.D. 1992); see also Jacoway v. Anderson (In re Ozark Restaurant Equipment Co.), 850 F.2d 342, 344-45 (8th Cir. 1988) (stating that the reasonable equivalent value analysis in fraudulent transfer cases requires consideration of "the entire situation" including market conditions); In re Northgate Computer Sys., Inc., 240 B.R. 328 (Bankr. D. Minn. 1999) (noting that the issue of whether debtor received reasonably equivalent value is fundamentally one of common sense, measured against market reality). "Despite lip service given to the weighing of other factors," often there is nothing to consider beyond simply comparing the fair market value of what the debtor transferred against the fair market value of what the debtor received. First Federal Sav. & Loan Ass'n of Bismarck v. Hulm (In re Hulm), 45 B.R. 523, 528 (Bankr. D.N.D. 1984). If the two values are reasonably similar, no fraudulent transfer has taken place. See 11 U.S.C. § 548(a)(1)(B)(I).

Other factors courts weighed in the consideration include the good faith of the parties, the difference between the amount paid and the fair market value, the percentage the amount paid is of fair market value, and whether the transaction was an arm's length transaction between a willing buyer and a willing seller. See Cooper v. Ashley Communications, Inc. (In re Morris Communications ND, Inc.), 914 F.2d 458, 467 (4th Cir. 1990).

In this case, after consistent losses, Sun Valley decided that the sale of its assets was a strategic and necessary move. The business was in immediate need of a cash infusion, and neither the shareholders nor its lender were willing to fund it. Sun Valley engaged in appropriate processes in its sale decision, including hiring Wayne Bradley, a business consultant, and two attorneys.

Sun Valley had operated in the small, competitive regional market of processors more than 25 years, and Sun Valley had sufficient information and reason to deem Red River Commodities was the most interested and viable potential purchaser. Cenex Harvest States had a right of first refusal to purchase Sun Valley's assets, and it did not take any action whatsoever to assert it. Sun Valley's president spoke with the owner of Sigco, but he was likewise uninterested in purchasing Sun Valley's assets. Sun Valley had discussed joining forces with two other members of the industry, Dahlgren and Dakota Natural Foods, but the parties had not come to terms.

Sun Valley's knowledge prior to the sale that the sale proceeds would be insufficient to pay all unsecured creditors in full, does not, standing alone, mean Sun Valley acted in bad faith or that the transfer of assets was for less than reasonably equivalent value. The financial condition of the business was deteriorating, and Sun Valley sought to attain the highest sale price possible under its increasingly dire circumstances. Time simply was not a luxury Sun Valley could afford because it knew that its assets would bring substantially less in an impending foreclosure sale. Wayne Bradley

15

and Attorney McNair worked with creditors to negotiate Sun Valley's debts. Wayne Bradley advised Sun Valley's shareholders that the sale was reasonable under the circumstances, and they acted in accordance with his recommendation in completing the sale. The Court concludes Sun Valley acted in good faith.

Red River Commodities likewise acted in good faith. It conducted due diligence and used a detailed method in evaluating the amount it was willing to pay for Sun Valley's assets based on the return on net capital.

In attempting to meet his burden of proving that $2.6 million was a not reasonably equivalent value for Sun Valley's assets on April 1, 2003, the trustee pits the expert opinion of Jeff Berg against the expert opinion of Joseph Ibach and the lay opinions of Doug Cossette, Wayne Bradley, Robert Majkrzak, and implicitly against the opinion of the other Sun Valley shareholders, regarding the reasonableness of the sale price.

First, experts often disagree on the appropriate valuation of corporate properties, even when using the same analytical tools. The outputs of financial valuation models are driven by their inputs, many of which are subjective in nature. Simply stated, when it comes to valuation issues, reasonable minds can and often do disagree. Notwithstanding, there are proper and improper methods of performing a valuation.

The Court agrees that Jeff Berg's appraisal lacked sufficient explanation and rationale for it to be reliable. He did not view the property on April 1, 2003, and he did not have personal knowledge of the condition of the land, buildings and equipment on the date of the sale. He conceded he prepared the appraisal in one week when it usually takes 6-8 weeks. He also conceded he was unfamiliar with some of the facility problems on the date of the sale. The testimony of Doug Cossette

16

and Robert Majkrzak described the many problems Red River Commodities acquired through its purchase of Sun Valley's assets that the appraisal does not acknowledge. In short, Jeff Berg's appraisal and testimony were not persuasive.

Considering Sun Valley's precarious financial situation, the condition of the equipment and facility on the date of the sale, the small number of potential buyers, the likelihood of reduced proceeds from a foreclosure sale, and the professional opinion of Wayne Bradley, the Court deems the sale price of $2,600,000.00 the best evidence in this case of the fair market value of the property. This consideration, weighed in conjunction with the good faith of the parties, the arm's length nature of the transaction, and all other factors, leads the Court to conclude that the sale of Sun Valley's assets to Red River Commodities was for reasonably equivalent value, and the trustee's claim under section 548(a)(1)(B) fails. The Court has considered all other arguments and deems them to be without merit.

For the foregoing reasons, the Complaint of Kip M. Kaler premised on 11 U.S.C. § 548 and N.D.C.C. § 13-02.1-04 is dismissed.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this July 13, 2005.

**WILLIAM A. HILL, JUDGE
U.S. BANKRUPTCY COURT**